HUANG vs. RE/MAX LEADING EDGE, 101 Mass. App. Ct. 150

 
 BIPING HUANG & another [Note 1] vs. RE/MAX LEADING EDGE & others. [Note 2]

101 Mass. App. Ct. 150
 December 13, 2021 - June 9, 2022

Court Below: Superior Court, Middlesex County
Present: Shin, Englander, & Hand, JJ.

 

No. 21-P-155.

Further appellate review granted, 490 Mass. 1106 (2022).

Broker, What constitutes relation, Commission. Frauds, Statute of. Contract, With broker, Implied, Performance and breach. Damages, Breach of contract, Loss of profits. Unlawful Interference. Practice, Civil, Motion to dismiss, Summary judgment.

In a civil action brought in Superior Court by a licensed real estate broker (plaintiff), claiming that her former clients (defendants) committed a breach of an oral agreement to give the plaintiff the exclusive right for one year to help them find and purchase a new home, the judge erred in granting summary judgment in favor of the defendants on the ground that such an agreement (the existence of which was a factual dispute on the summary judgment record) was unenforceable because it was not reduced to writing, where an express exemption in the Statute of Frauds provides that a contract to pay for the services of a licensed real estate broker need not be in writing to be enforceable; and where the defendants did not otherwise challenge the enforceability of the agreement or argue that the plaintiff would be unable to prove breach and damages (i.e., prospective commissions as expectation damages brought about by the defendants' breach). [154-163] Englander, J., dissenting.

In a civil action brought in Superior Court by a licensed real estate broker (plaintiff), claiming that her former clients (defendants) had committed a breach of an oral agreement to give the plaintiff the exclusive right to sell their home, the judge correctly granted summary judgment in favor of the defendants, where, given that the agreement had no specified duration and imposed no obligations on the plaintiff, it was terminable by the defendants at will at any time before performance by the plaintiff. [163-164]

A Superior Court judge correctly dismissed claims brought by a licensed real estate broker against another broker (defendant), alleging unlawful interference and violation of G. L. c. 93A, where the complaint was void of allegations that the defendant had acted with improper motive or means. [164-165]

Civil action commenced in the Superior Court Department on August 1, 2017. 

 Page 151 

 A motion to dismiss was heard by John T. Lu, J., and the case was heard by Janice W. Howe, J., on a motion for summary judgment. 

 Charles G. Devine, Jr. (Lei Zhao Reilley also present) for the plaintiffs.

 John D. Leone for Xinhang Sun & another.

 Jennifer L. Markowski for RE/MAX Leading Edge & another.

 SHIN, J. Biping Huang, a licensed real estate broker, claims that her former clients, Xinhang Sun and Jing Ma, committed a breach of a verbal agreement to give Huang the exclusive right for one year to help them find and purchase a new home in Winchester. [Note 3] According to Huang, after she performed diligently under the agreement for several months, Sun and Ma revoked the agency without cause and purchased a home through a different broker, RE/MAX Leading Edge. Around the same time, Sun and Ma hired RE/MAX Leading Edge to sell their existing home, also purportedly in violation of their verbal agreement with Huang.

 Huang filed a complaint in Superior Court based on these allegations, raising a breach of contract claim against Sun and Ma and claims of tortious interference and G. L. c. 93A violations against RE/MAX Leading Edge and its owner, Paul Mydelski (together, RE/MAX). A judge allowed RE/MAX's motion to dismiss the claims against it under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), and a second judge allowed Sun and Ma's motion for summary judgment. Huang appeals, arguing that the respective judges erred in allowing the motion to dismiss and the motion for summary judgment. 

 We conclude that summary judgment should not have entered as to that part of Huang's claim that is premised on Sun and Ma's alleged agreement to give Huang the exclusive right to act as their buyer's agent for one year. While accepting as true Huang's assertion that such an agreement existed, the second judge concluded that the agreement was unenforceable because it was not reduced to writing. Pursuant to an express exemption in the Statute of Frauds, however, a contract to pay for the services of a licensed real estate broker need not be in writing. As Sun and Ma do not otherwise challenge the enforceability of the agreement, nor do they argue that Huang will be unable to prove breach and damages, we vacate so much of the judgment as grants summary 

 Page 152 

judgment to Sun and Ma on Huang's claim related to the buyer's agent agreement. We affirm the remainder of the judgment.

 Background. The following facts, many of which are disputed, are taken from the summary judgment record. We recite them in the light most favorable to Huang, the nonmoving party. See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680 (2016).

 On May 22, 2016, Huang entered into a verbal agreement with Sun and Ma to act as their "exclusive buyer's agent." [Note 4] The terms of the agreement, as attested to by Huang, were as follows. For a period of one year, Huang would have the "exclusive right to help [Sun and Ma] in their procuring a new home that was acceptable for purchase by them." To that end, Sun and Ma "agreed to refer all potentially acceptable real property to [Huang] and to notify other real estate agents of [the] exclusive agency." In exchange, Huang agreed to use "reasonable efforts" to help Sun and Ma find and purchase a new home, including by "assist[ing] in locating properties, . . . arrang[ing] showings, analyz[ing] financing alternatives, giv[ing] advice concerning real estate practices and procedures, assist[ing] in negotiations, arrang[ing] inspections . . . , and coordinat[ing] activities throughout the process." Huang's "compensation would be paid directly from the listing fee," but "[i]f the fee received from the listing agent was less than [two percent] or there was no listing agent involved and the [s]eller refused to pay a commission," Sun and Ma were responsible for "the difference up to [two percent] of the sales price." Sun and Ma were entitled to terminate the agreement if dissatisfied with Huang's performance and Huang did "not cure[] within a reasonable period of time after notice."

 At the same meeting, Sun and Ma requested that Huang serve as the listing agent for their current home, located on Vine Street in Winchester, once they found a new home to purchase. Huang provided an estimated value of the Vine Street property, and the parties agreed that Huang, as "exclusive agent," would sell it for a discounted listing agent fee, plus a standard fee paid to the buyer's agent if one existed.

 It is undisputed that, between May 2016 and February 2017, Huang showed Sun and Ma a number of homes for sale in Winchester and advised them about matters such as property evaluations and mortgage applications. Huang drafted and submitted 

 Page 153 

offers on behalf of Sun and Ma for four of these homes, including one on Hemingway Street. In early February 2017, after a month-long negotiation between Huang and the seller of the Hemingway Street home, Sun and Ma indicated that they were prepared to accept the seller's most recent counteroffer. To help complete the purchase, Huang agreed to provide Sun and Ma a three-month bridge loan. She prepared a loan agreement and later revised it after Sun and Ma asked that the amount of the loan be rewritten for tax purposes.

 Sun and Ma did not go forward on their purchase of the Hemingway Street property, however. Instead, on February 18, 2017, days after asking Huang to revise the loan agreement and with no notice to her, Sun and Ma made an offer to purchase a property on Bridge Street in Winchester. The offer, which was accepted the same day, stated that Sun and Ma were "introduced" to the property by "RE/MAX Leading Edge." Two days later, Sun and Ma sent Huang an e-mail message stating: [Note 5]

"We have decided to hire an American agent at Re/Max to buy a house. Because that house has not yet been listed on the market, they would not agree to have you contact them as our buyer's agent on our behalf. [Note 6] Therefore we really are very sorry. After all you have shown us so many houses, responded to every request from us, and left no questions from us unanswered. We have prepared an Amazon gift card for you. It is merely a token of our appreciation and we cannot express our gratitude enough. Please accept it."

 In April 2017 Sun and Ma purchased the Bridge Street property for $999,000. The same month, they sold the Vine Street property, with RE/MAX as listing agent, for $502,000. 

 Discussion. 1. Summary judgment. We review a grant of summary judgment de novo to determine whether, viewing the facts most favorably to the nonmoving party, the moving party is entitled to judgment as a matter of law. See Bulwer, 473 Mass. at 680. The elements of a breach of contract claim are "that there 

 Page 154 

was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." Id. at 690. Although Huang would have the burden of proof at trial, it was Sun and Ma's burden on summary judgment to show that Huang "ha[d] no reasonable expectation of proving" one of these elements. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991).

 a. Buyer's agent agreement. Huang argues that, contrary to the second judge's rationale for granting summary judgment, a verbal agreement to provide real estate brokerage services is valid and enforceable in Massachusetts. Sun and Ma argue otherwise, pointing to our statement in Cantell v. Hill Holliday Connors Cosmopulos, Inc., 55 Mass. App. Ct. 550, 555 (2002), that "[a]bsent a written agreement to the contrary, a real estate broker is entitled to a commission only if the broker is the efficient and predominating cause of [the] subsequent transaction between the parties." Based on this, Sun and Ma contend that, even if they verbally agreed that Huang would be their exclusive buyer's agent for one year, Huang's claim is still subject to "the general rule that required Huang to show that she was the 'efficient and predominating' cause" of Sun and Ma's purchase of the Bridge Street property. In essence, this is an argument that a real estate brokerage contract must be in writing to be enforceable.

 As Huang correctly observes, however, the Statute of Frauds contains an express exemption for "contract[s] to pay compensation for professional services of . . . a licensed real estate broker or real estate salesman acting in their professional capacity." G. L. c. 259, § 7. See Meredith & Grew, Inc. v. Worcester Lincoln, LLC, 64 Mass. App. Ct. 142, 152 (2005) (commercial mortgage brokering services fell within exemption in G. L. c. 259, § 7, for services provided by "real estate broker," and so agreement to pay for such services was not required to be in writing). Our statement in Cantell -- which did not involve a real estate brokerage contract at all -- was dictum, and elsewhere in the opinion we recognized that the Statute of Frauds contains exemptions for certain "providers of services, such as . . . licensed real estate brokers." Cantell, 55 Mass. App. Ct. at 553. [Note 7] Furthermore, although we quoted Cantell's dictum in Zang v. NRT New England Inc., 77 Mass. App. Ct. 665, 

 Page 155 

673 (2010), that part of Zang was itself dictum, as the Statute of Frauds was not germane to our decision. To the extent that dictum conflicts with the Statute of Frauds, the text of the statute must prevail. See Tristram's Landing, Inc. v. Wait, 367 Mass. 622, 630 (1975) (requirement that real estate brokerage contract be in writing "may be worthy of legislative consideration, but we do not think we should establish such a requirement by judicial decision").

 Sun and Ma raise no other argument why they are entitled to judgment as a matter of law. They do not argue that the agreement was unsupported by consideration or that Huang was not "ready, willing, and able to perform." Bulwer, 473 Mass. at 690. Nor do Sun and Ma contest that, if there were an exclusive agreement with the terms described by Huang, a genuine issue exists whether they committed a breach by purchasing the Bridge Street property through RE/MAX. [Note 8] Most importantly for our purposes, Sun and Ma do not argue that there are no genuine issues whether the parties entered into an exclusive agreement or whether Huang incurred damages from Sun and Ma's purported breach of it. [Note 9]

 Nonetheless, in light of the points raised by the dissent, we offer the following observations on the latter two issues. First, the dissent suggests that there is insufficient evidence of the existence of an exclusive agreement. See post at 172-173. It may well be that Huang will ultimately be unable to meet her burden of proof in this respect. But the case comes to us on summary judgment, and Huang averred in an affidavit that the parties agreed she would 

 Page 156 

have the exclusive right for one year to help Sun and Ma buy a new home and, in exchange, she would engage in diligent efforts on their behalf. This affidavit was sufficient to create a factual dispute on the question, particularly where Sun and Ma -- the parties with the burden on summary judgment -- did not argue to the contrary in their motion. [Note 10]

 Second, the dissent concludes that, even if Huang is able to prove the existence of an exclusive agreement and breach, she cannot, as a matter of law, recover the amount of the commission as expectation damages because she has offered no evidence that the parties expressly agreed that Sun and Ma would owe her the commission if they purchased a home through another broker. Put another way, the dissent would adopt a rule that a real estate broker cannot recover a commission as expectation damages caused by a breach of an exclusive contract unless the contract itself contains a "clear statement" that the broker is entitled to that remedy. We do not agree that the case law calls for this result.

 In the ordinary course, "loss of prospective profits as an element of damages for breach of contract . . . may be recovered when it appears to have been within the contemplation of the parties as a probable result of breach of the contract, to be its natural, primary and probable consequence, and to be susceptible of proof by evidence reasonably certain." Randall v. Peerless Motor Car Co., 212 Mass. 352, 380 (1912). In Randall the parties agreed that the plaintiff would have the exclusive right to sell the defendant's cars in the New England territory for a fixed term. See id. at 369-370. The court held that, where the defendant terminated the contract without justification, the plaintiff was entitled to recover as expectation damages the percentage of the sales he likely would have earned had the defendant's breach not prevented him from performing. See id. at 380. See also Wier v. American Locomotive Co., 215 Mass. 303, 310 (1913) ("It fairly could be inferred that the parties contemplated, as the measure of damages for a breach caused by the defendant's wrongful sale in the plaintiff's exclusive territory, the amount that the plaintiff would receive if the sale had been made by it"). Similarly, in Lattuca v. Cusolito, 343 Mass. 747, 753 (1962), a real estate 

 Page 157 

brokerage case, the court held that the broker could recover, as a consequence of the defendant's breach of an exclusive contract, "the amount of commissions which [the broker] might have earned on sales had she not been prevented from fully performing the contract."

 The cases cited by the dissent do not support deviating from the usual rule. [Note 11] The issue decided in Bartlett v. Keith, 325 Mass. 265 (1950), and Des Rivieres v. Sullivan, 247 Mass. 443 (1924), was not whether the commission was owed as damages, but whether there was a contract. Both cases stand for the proposition that, where "[t]he broker's power was not coupled with an interest," the seller's promise was "unilateral" -- i.e., unsupported by consideration -- and thus revokable at will at least until the broker procured a buyer willing to purchase the property on the seller's terms. Des Rivieres, supra at 446, 448. See Bartlett, supra at 267 ("defendant's promise was just as much unilateral and equally without consideration" as in Des Rivieres). The Supreme Judicial Court characterized Bartlett in this very way one year later in Coan v. Holbrook, 327 Mass. 221, 223 n.1 (1951), explaining that Bartlett "held that an exclusive right to sell for a fixed period contained in a unilateral promise without consideration may be revoked during the period." Because the exclusive agreement in Coan was, unlike in Bartlett, "bilateral" and "founded on consideration" (of "one dollar" and the broker's "efforts"), the court determined that it was nonrevocable during its stated term. Id. at 223 & n.1. 

 The court elaborated further on Bartlett and Des Rivieres in Dragone v. Dell'Isola, 332 Mass. 11 (1954). There, the court held that, because "there was no employment contract binding the plaintiff [broker] to perform and the defendant to pay for his services," the case fell within the "ordinary situation" illustrated by Bartlett and Des Rivieres "where the defendant did no more than to promise to pay a commission to the plaintiff if he procured a customer ready, able, and willing to buy upon the [defendant's] terms." Dragone, supra at 12-13. In other words "[t]he defendant's offer was not supported by any consideration," and so "[t]he plaintiff was free to disregard the offer or attempt to undertake the called for performance, and the defendant was also free to withdraw the offer" at least until the plaintiff procured an acceptable 

 Page 158 

customer. Id. at 13. See Lattuca, 343 Mass. at 751-752 (whereas one exclusive agreement "was supported by consideration . . . and irrevocable during the period while the agency continued," another might not have been "supported by any consideration" and so, under Bartlett and Des Rivieres, "would be a unilateral promise" that "could be revoked at any time prior to the sale of the property").

 Our cases are consistent. As we explained in Samuel Nichols, Inc. v. Molway, 25 Mass. App. Ct. 913, 914 (1987), in both Bartlett and Des Rivieres, the agreement "by reason of its failure to require any performance from the broker, was held a unilateral contract which the owner might terminate at will, provided the broker had not before then achieved a sale, and thereby delivered the consideration." In contrast, the exclusive contract at issue in Samuel Nichols, Inc. required the broker to "undertak[e] to find a purchaser," which we said "connote[d] some expenditure of energy or money on advertising such as a broker of ordinary industry might be expected to put forth." Id. at 915. We thus concluded that the exclusive contract was "bilateral and binding," and so the seller "could not unilaterally extricate himself from the arrangement without cost." Id. See Upper Cape Realty Corp. v. Morris, 53 Mass. App. Ct. 53, 58 (2001) (similar). Accord Bump v. Robbins, 24 Mass. App. Ct. 296, 303-304 (1987). 

 Here, Sun and Ma do not argue that the agreement was unsupported by consideration, and we think in any event that, under the cases just cited, Huang's affidavit -- which avers that the terms of the agreement required her to use "reasonable efforts" to help Sun and Ma procure a new home and identified steps she was specifically required to undertake -- was sufficient to create a factual dispute on the question. With that hurdle cleared, Bartlett and Des Rivieres have no remaining relevance to the analysis.

 Tristram's Landing, Inc., 367 Mass. 622, also did not concern any question of damages. There, "[t]he defendant agreed that the plaintiffs could act as brokers, although not as exclusive brokers," and authorized them to show her property. Id. at 623. The brokers secured a buyer, who signed a purchase and sale agreement but later defaulted. The issue was whether the brokers earned the commission even though the sale did not close. After determining that specific language in the purchase and sale agreement foreclosed the brokers' claim, see id. at 626-627, the court held that, prospectively, absent contrary language in the brokerage agreement or purchase and sale agreement or a "wrongful act or 

 Page 159 

interference of the seller," a broker earns the commission if the broker produces a "ready, willing and able" buyer, the buyer and seller enter into a binding contract, and the sale is consummated. Id. at 629, quoting Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 551 (1967).

 We applied Tristram's Landing, Inc., in Currier v. Kosinski, 24 Mass. App. Ct. 106 (1987), which arose in the same factual context. The parties entered into an ordinary brokerage arrangement, the broker located a buyer, but the buyer and seller did not enter into a contract or complete the sale. We concluded that the brokerage contract -- which provided that the broker would earn his commission if he procured a "ready, willing and able" buyer -- was not specific enough to vary the rule in Tristram's Landing, Inc., because it did not expressly negate the requirements that there be a binding purchase and sale contract and consummation of the sale. See id. at 107-108.

 Neither Tristram's Landing, Inc., nor Currier addresses whether, and in what circumstances, a broker may recover the amount of the commission as expectation damages for a principal's breach of an exclusive agreement. The question in those cases was whether the broker earned the commission -- that is, whether the agreement entitled the broker to the commission. In contrast here, Huang's claim is not that she earned the commission under the agreement, but that she is owed the commission as damages because, by hiring another broker and repudiating their exclusive arrangement, Sun and Ma prevented her from performing. This distinction is succinctly explained in Drew v. Maxim, 150 Me. 322 (1954). There, after a trial, the broker was awarded the commission as damages for the defendant's breach of an exclusive agreement. In rejecting the defendant's argument that the award was improper because "a broker can never receive a commission on a sale in which he was not the procuring cause," the Maine Supreme Judicial Court explained that that rule was "not applicable" because the defendant's breach "prevented the plaintiff from making the sale." Id. at 324. In other words the plaintiff did "not seek a commission for a sale completed by her, but damages for breach of a contract under which so far as defendant was concerned she had an exclusive agency to make the sale." Id. at 324-325. [Note 12]

 Page 160 

 Extending Currier's "clear statement" rule to these circumstances, as the dissent proposes, post at 168, would mean in effect that a broker could never recover a commission as expectation damages for breach of an exclusive brokerage contract. Instead, in every case, the question would reduce to whether the language of the contract entitles the broker to the commission. This is not consistent with Lattuca, 343 Mass. at 752-753, where the court held that the broker could recover prospective commissions as expectation damages brought about by the defendant's breach. Tristram's Landing, Inc., did not even mention Lattuca, let alone overrule it, which is unsurprising given the disparate contexts in which the cases arose. [Note 13] Furthermore, to our knowledge, every jurisdiction that has considered whether a commission may be awarded as expectation damages for breach of an exclusive contract is in accordance with Lattuca. See, e.g., Mattingly v. Bohn, 84 Ariz. 369, 371 (1958) ("The general rule [is] that when an exclusive right . . . is given and the owner makes a sale through another agent in violation of the exclusive listing, the measure of damages is the amount of commission the plaintiff would have earned had he made the sale"); Carlsen v. Zane, 261 Cal. App. 2d 399, 402 (1968) ("The damages awarded in cases where exclusive broker agreements have been breached may be the full commission provided in the listing agreement where the property is withdrawn from sale by the owner's action"); Guber v. Peters, 

 Page 161 

149 N.J. Super. 138, 142 (App. Div. 1977) (commission "represented the proper measure of damages reasonably calculated to compensate the broker . . . for the benefit of his bargain frustrated by the owners' wrongful act"). [Note 14], [Note 15]

 It is true that each of these cases is factually distinguishable. Some involved commercial contracts and sophisticated parties; others involved bad faith on the part of the principal. But this serves only to underscore why the question of damages should ordinarily be left to the fact finder. See Rombola v. Cosindas, 351 Mass. 382, 385 (1966) ("The right to recover prospective damages must in each case be decided on its own facts, and a comparatively insignificant factor, in combination with others, may lead to a conclusion in one decision apparently at variance with that reached in others"). Treating the question instead as one of contract interpretation will leave no room for consideration of circumstances that may be relevant to the parties' expectations, including any history of prior dealings, the parties' relative levels of sophistication, the nature and timing of the breach, how much work the broker has performed under the contract, and whether any party has acted in bad faith.

 The dissent states that we have set up a "straw man." Post at 172. This is because, the dissent says, a clear statement rule will still allow a broker to recover a commission as expectation damages in some circumstances -- namely, "where the parties have clearly stated, in their agreement, that the broker is so entitled." Id. But a commission awarded in that circumstance would not be expectation damages for breach of the exclusivity provisions of 

 Page 162 

the contract. Rather, the broker would be owed the commission because the seller's nonpayment of the commission would itself be a breach of the contract.

 Two examples help illustrate the point. A sophisticated party agrees to give a broker the exclusive right for one year to sell a commercial property. While the broker is performing diligently under the contract, the seller secretly negotiates with a different broker. Well into the contract term, the seller agrees to sell the property to a buyer procured by the other broker, who charges a lesser fee. Although the seller has committed a breach of the exclusivity provisions of the contract, under a clear statement rule, in no circumstances would the contracting broker be entitled to the amount of the commission as damages if the contract did not expressly provide for that remedy.

 Consider instead a situation where an inexperienced seller agrees to give a broker the exclusive right for one year to sell his home and further agrees, by oversight or without full understanding, to pay a commission if the home is sold through the broker or through others. Shortly into the contract term, the seller becomes dissatisfied with the broker's efforts and, needing to sell the home quickly, arranges on his own to sell it to a friend. The broker demands the commission. If the seller does not pay, he is independently in breach of the contract and could be liable for the full commission regardless of whether it was a loss that the parties contemplated as the "natural, primary and probable consequence" of his breach of the exclusivity provisions of the contract. Randall, 212 Mass. at 380.

 As the foregoing examples illustrate, were we to adopt a clear statement rule in this context, a commission would not be available as expectation damages for breach of a contract's exclusivity provisions; rather, the broker's entitlement would depend solely on whether the contract itself provides for payment of the commission. No Massachusetts case sanctions this approach, and as far as we are aware, no other jurisdiction follows it. Nor can we say whether such an approach would be wise as a matter of public policy. While the dissent cites the need to protect inexperienced home sellers and buyers, the record and briefing are inadequate for us to assess whether a clear statement rule would accomplish that objective or whether it would affect settled practices in the industry. We can only speculate as to its effect on future contract negotiations: sophisticated parties may be unwilling to yield their positions on whether to include a "clear statement provision" in 

 Page 163 

the contract, while brokers will have every incentive to persuade inexperienced parties to agree to it. In addition, because the rule would apply retroactively, sellers and buyers in existing exclusive arrangements would be free to abandon them without liability to pay a commission (barring a clear statement to the contrary in the contract), irrespective of how much work the broker might have already performed and even if that outcome would be contrary to the expectations of the parties.

 We note also that there are rules already in place that serve to protect the inexperienced home seller and buyer. For instance, to establish the existence of an exclusive brokerage, Huang has the burden of proving that "the parties . . . expressly and unambiguously indicate[d] such an intent in the contract." Bump, 24 Mass. App. Ct. at 304. This burden is a heavy one, especially where the purported exclusive agreement has not been reduced to writing. Moreover, if Huang meets this burden and also proves breach, then, as we have discussed, under the usual rule governing expectation damages, she can recover the commission only upon proof that it was "within the contemplation of the parties as a probable result of breach" and "its natural, primary and probable consequence." Randall, 212 Mass. at 380. Whether one of the parties has greater bargaining power is intrinsic to that inquiry. Sun and Ma do not argue that a different rule of damages should apply; if they believe that one should, however, they may make that argument, and any other arguments they have regarding damages, on remand. [Note 16]

 b. Listing agreement. The listing agreement stands on different footing. We agree with Sun and Ma that this part of Huang's claim falls under the rule that, for an exclusive agreement to be enforceable, "the broker must be more than a passive recipient of the grant of exclusive agency; the broker must agree to do something, such as advertising the property and making diligent effort to find a buyer on the seller's terms." Samuel Nichols, Inc., 25 Mass. App. Ct. at 913. An agreement that does not require any performance by the broker is terminable "at will, provided the broker had not before then achieved a sale, and thereby delivered 

 Page 164 

the consideration." Id. at 914. See Des Rivieres, 247 Mass. at 446 (because seller's promise was "without consideration until the performance of the condition," it "could be revoked at any time before performance by the [broker]"). Accord Bartlett, 325 Mass. at 267.

 The agreement here, as described by Huang, was that she would act as Sun and Ma's exclusive listing agent for the Vine Street property once Sun and Ma found a new home to purchase. The agreement had no specified duration and imposed no obligations on Huang. Sun and Ma were thus entitled to revoke their promise at least until Huang "procur[ed] . . . a customer who was able, willing, and ready to buy on [their] terms." Bartlett, 325 Mass. at 267. As it is undisputed that Sun and Ma terminated their relationship with Huang before that condition was satisfied, summary judgment was proper on the portion of the claim against Sun and Ma related to the listing agreement.

 2. Dismissal of claims against RE/MAX. Huang raised three claims against RE/MAX: intentional interference with contractual relations, intentional interference with advantageous business relations, and unfair and deceptive trade practices under G. L. c. 93A. The factual basis for all of the claims is that RE/MAX refused to show Sun and Ma the Bridge Street home if they were "already working with another real estate agent," thereby inducing Sun and Ma to terminate their relationship with Huang. 

 To state a claim for intentional interference with a contractual or advantageous business relationship, the complaint must plausibly allege, among other things, that the defendant knew of the relationship and interfered with it in a way that was "improper in motive or means." Psy-Ed Corp. v. Klein, 459 Mass. 697, 715 (2011). See Skyhook Wireless, Inc. v. Google Inc., 86 Mass. App. Ct. 611, 619 (2014). "[S]omething more than intentional interference is required." United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815 (1990). The additional element is "improper conduct[, which] may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion)" (quotation and citation omitted). Cavicchi v. Koski, 67 Mass. App. Ct. 654, 658 (2006). "Improper means include violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation." Id.

 Here, the complaint is void of allegations that RE/MAX acted with improper motive, such as discrimination, retaliation, or "ill will." Cavicchi, 67 Mass. App. Ct. at 658. See Comey v. Hill, 387 Mass. 11, 

 Page 165 

19 (1982). Cf. United Truck Leasing Corp., 406 Mass. at 817 (defendant's "apparent motives . . . to benefit his customers and himself financially" did not warrant finding of improper interference). Nor do we think that the complaint plausibly suggests that RE/MAX acted with improper means. The complaint does not allege that RE/MAX "violated a statute or a rule of common law" or "used threats, misrepresented any facts, [or] defamed anyone." Id. Although Huang posits that RE/MAX violated the Code of Ethics and Standards of Practice of the National Association of Realtors (code), she cites no case holding that violation of a code of professional ethics qualifies as an improper means for purposes of a tortious interference claim. And even assuming that it does, Huang's claims still would not survive dismissal. Huang points to a provision of the code that states: "REALTORS shall not engage in any practice or take any action inconsistent with exclusive representation or exclusive brokerage relationship agreements that other REALTORS have with clients." This provision does not aid Huang because the complaint does not allege that RE/MAX knew that she had an exclusive buyer's agent agreement with Sun and Ma at the time RE/MAX engaged in the conduct claimed to be tortious. The complaint's vague assertions that RE/MAX "knew or should have known of the existence of the contractual relationship" and that RE/MAX "had knowledge of [Huang's] existing business relationship with [Sun and Ma]" are inadequate to establish that RE/MAX knew that the buyer's agent agreement was exclusive. See Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008). [Note 17] 

 As for the c. 93A claim, the only unfair or deceptive practice the complaint identifies is RE/MAX's alleged "interfer[ence] with [Huang's] contractual and advantageous business relationships." Because the complaint fails to state a claim for tortious interference, the c. 93A claim was also correctly dismissed. [Note 18]

 Conclusion. That portion of the judgment granting summary 

 Page 166 

judgment for Sun and Ma on Huang's claim relating to the buyer's agent agreement is vacated. The judgment is otherwise affirmed. [Note 19]

 So ordered.

 ENGLANDER, J. (dissenting in part). It is undisputed that the plaintiff real estate broker, Biping Huang, had no involvement in Xinhang Sun and Jin Ma's purchase of their new home on Bridge Street in Winchester. Nevertheless, Huang wishes to be paid a "commission" on that purchase, and the majority's decision sanctions that result; the majority holds that because the claimed oral brokerage agreement was "exclusive," Huang would be entitled to the commission as damages in the event she is able to prove the agreement she claims, and its breach. 

 In my view the majority's conclusion is at odds with at least a century of Massachusetts case law. Beginning with Des Rivieres v. Sullivan, 247 Mass. 443, 448 (1924), and running through Bartlett v. Keith, 325 Mass. 265, 267 (1950), Tristram's Landing, Inc. v. Wait, 367 Mass. 622, 625 (1975), and its progeny, and finally decisions of this court such as Currier v. Kosinski, 24 Mass. App. Ct. 106, 107 (1987), and Bump v. Robbins, 24 Mass. App. Ct. 296, 304 (1987), our courts have held, time and again, that a broker may not recover a commission where the broker's efforts did not contribute to, and result in, a completed transaction. Those cases evidence a distinct policy aversion to claims of the type before us; in my view, a broker may only recover on such a claim for a commission if the contract on which they rely contains a clear statement that the broker is entitled to receive a commission regardless -- that is, regardless of whether the broker played any role in effecting the desired sale or purchase. Currier, supra. Because no such clear statement is contained in the contract that Huang claims and attests to, she may not recover a commission as a matter of law. I accordingly dissent from the majority's conclusion on that issue, and would affirm the summary judgment in favor of Sun and Ma. [Note Dissent-1] 

 Page 167 

 As indicated, the basic error in the majority's conclusion is that it would allow Huang to be awarded a commission, even though (1) Huang did not contribute to facilitating the transaction, and (2) Huang never made it clear to Sun and Ma that she nevertheless would have to be compensated under such circumstances. The sum and substance of the majority's reasoning is that by saying to the defendants that their broker agreement would be "exclusive," Huang said all she needed to say; the buyers then had to understand that they were obligated to work only with and through Huang and, in the event of a completed transaction, to compensate Huang by commission regardless of whether her efforts had borne fruit. Indeed, an unspoken consequence of the majority's conclusion is that Huang can be entitled to her commission even if Sun and Ma (or someone else, i.e., the seller), were obligated to pay another commission to an agent who actually facilitated the Bridge Street purchase.

 The Supreme Judicial Court has several times rejected similar claims by real estate brokers. Thus, in Bartlett, 325 Mass. at 265, the agreement at issue stated:

"June 16, 1947, Exclusive sale of property. #26 Prospect St., West Bridgewater Mass., to my agent Florence M. Bartlett. We are asking $12,000 (will take as low as $11,000). She is to have exclusive sale of same -- for [ninety] days. [Sgd.] Phyllis L. Keith."

 The broker performed work attempting to sell the property, unsuccessfully. Bartlett, 325 Mass. at 266. The owner ultimately secured a buyer, within the stated time period, without aid from the broker. Id. The Supreme Judicial Court rejected the broker's claim for a commission, reasoning that the seller's promise was conditioned on the broker producing "a customer who was able, willing, and ready to buy on the owner's terms," and therefore that the agreement was "unilateral" and revokable until the broker so performed. [Note Dissent-2] Id. at 267-268. The court in Bartlett relied heavily on the earlier decision of Des Rivieres, 247 Mass. at 448, where 

 Page 168 

the court stated: "The offer appointing the plaintiff to secure a customer, and giving him the exclusive agency, was revocable and was in fact revoked by the sale to one whom the plaintiff did not produce." Bartlett, supra at 267, quoting Des Rivieres, supra.

 Granted, Bartlett and Des Rivieres are somewhat dated, as is the language those cases employ. [Note Dissent-3] Moreover, Bartlett and Des Rivieres could perhaps be distinguished on the ground that in those cases the owners secured the buyers themselves, and thus did not engage with a different agent to facilitate their sale. See Bartlett, 325 Mass. at 266; Des Rivieres, 247 Mass. at 446-447. Be that as it may, I find the reasoning of Bartlett and Des Rivieres instructive here, because the reasoning indicates that absent an explicit agreement otherwise, a broker's right to receive a commission depends upon the broker producing a buyer (or in this case, producing a property for purchase) that meets the terms of the principal. See Bartlett, supra at 267; Des Rivieres, supra at 448. And at minimum, Bartlett and Des Rivieres establish that the right to a commission does not arise from the mere use of the term "exclusive." See Bartlett, supra at 265; Des Rivieres, supra at 445. 

 Similar principles have been established in subsequent Massachusetts cases, which hold that as a general rule, a broker will not be compensated out of a purchase price unless the broker contributed to an actual sale. The Supreme Judicial Court set forth this rule in Tristram's Landing, 367 Mass. at 629, which held "that the seller will not be liable for a broker's commission unless three conditions are met: (1) the broker produces a buyer ready, willing, and able to buy on the terms set by or agreed to by the seller; (2) the seller enters into a binding contract to sell; and (3) the sale is consummated, unless the consummation is wrongfully thwarted by the seller." Currier, 24 Mass. App. Ct. at 107 (paraphrasing Tristram's Landing and subsequent cases). [Note Dissent-4] The rule of Tristram's Landing has been consistently applied since it issued. See, e.g., Hillis v. Lake, 421 Mass. 537, 542 (1995).

 Page 169 

 In this case, where Huang did not contribute to the Bridge Street purchase, the question is whether her claimed "exclusive" contract could nevertheless allow her to avoid the general rule. In that regard, I find the decision in Currier, 24 Mass. App. Ct. 106, instructive. Currier involved a claim for a commission where the seller's agent performed work, but where ultimately the sale was not consummated. Id. at 107-108. This court held that the broker was not entitled to a commission. Id. at 109. The opinion first described the rule of Tristram's Landing that a sale needed to be consummated, noting that the policy articulated was "grounded in the reasonable expectations of the typical seller of residential real estate." Id. at 107. We pointed out that the rule of Tristram's Landing can be varied by contract: "The parties (broker and seller) can agree between themselves that the broker's commission will be earned without compliance with [Tristram Landing's] conditions." Id. We went on, however, to establish what amounts to a "clear statement" requirement -- if the broker wishes to vary the general rule and to be paid even though they have not facilitated a sale,

"bearing in mind the purpose of the rule to protect the reasonable expectation of the inexperienced home seller that the brokerage commission will be payable out of the purchase price on sale, . . . we think that a provision in a brokerage agreement varying the rule should be made to appear with enough specificity to alert the seller to the situations in which he can be liable for a broker's commission even if a sale is not consummated."

Id.

 To be sure, Currier dealt with a different factual situation, as in that case a sale was never consummated. See Currier, 24 Mass. App. Ct. at 107. But the concerns so well expressed in Currier also obtain here. In enforcing real estate broker agreements, there is a need to protect the reasonable expectations of the often inexperienced home buyer (or seller), who may well not appreciate that the broker, merely by stating orally (or in writing) the word "exclusive," might claim a commission even if the broker does nothing to aid a particular purchase and, indeed, even if the buyers or sellers owe a commission to someone else. See id. The requirement of such a clear statement is sound, particularly given that the broker agreement need not be in writing. G. L. c. 259, § 7. 

 Page 170 

It appropriately balances the expressed concerns over protection of inexperienced contracting parties, with important principles of freedom of contract. Currier, supra. Accordingly, while the broker and the principal are free to make an agreement different from the rule of Tristram's Landing, it must be made "with enough specificity to alert [the buyer] to the situations in which [the buyer] can be liable" even if the broker does not facilitate the purchase. See Currier, supra. Cf. Bump, 24 Mass. App. Ct. at 304 ("To create an exclusive brokerage . . . the parties must expressly and unambiguously indicate such an intent in the contract"). As there is no such clear statement in the alleged contract here, Huang's claim must fail. 

 In adopting the contrary position, the majority posits that this case can be decided by applying common principles of contract law. It rules that there is sufficient evidence of a contract (despite Bartlett and Des Rivieres), and also sufficient evidence of its breach. The only remaining issue then would be one of damages, which the majority holds can include the broker's expectation damages -- that is, the commission. And, the majority points out, there are other Massachusetts cases -- at least two -- that appear to hold that a broker can recover a commission as expectation damages, for breach of an exclusive brokerage contract.

 Pausing here, I note that even the majority seems to agree that there is no Massachusetts case on all fours with this one, and certainly no recent case that addresses the issues surrounding construction and enforcement of "exclusive" broker agreements. Inasmuch as there are likely thousands of broker contracts entered into in the Commonwealth each year, the issues raised here could benefit from further attention.

 In any event, I find the reasons the majority gives for its contrary conclusion unpersuasive. [Note Dissent-5] First, the majority picks its way 

 Page 171 

through the Massachusetts case law, distinguishing the above cases on various grounds. Thus, Bartlett and Des Rivieres are set aside on the theory that they are merely contract formation cases in which the court found that the broker had not supplied any "consideration," and that once consideration exists those cases "have no remaining relevance." Ante at 158. But Bartlett and Des Rivieres are simply not distinguishable on that ground; there is no material difference between the actions of the brokers in those cases -- actually working to locate a buyer who would meet the terms of the principal -- and the actions Huang relies upon as consideration here. [Note Dissent-6] See Bartlett, 325 Mass. at 266; Des Rivieres, 247 Mass. at 445. Rather, in my view, Bartlett and Des Rivieres are best understood as early reflections of Massachusetts policy that absent a clear statement in the contract, a broker has not performed and will not be allowed to recover a commission unless he or she contributes to an actual sale. [Note Dissent-7]

 The majority's efforts to distinguish Tristram's Landing and Currier similarly fall short. We are told that neither case addressed the question of damages -- specifically, whether "a broker may recover the amount of the commission as expectation damages for a principal's breach of an exclusive agreement." Ante at 159. True, but what both cases do address are the circumstances under which a broker may be compensated by commission. And what both cases state, unequivocally, is the general rule that a broker is not entitled to a commission under Massachusetts law unless (1) the broker is the efficient cause of a completed transaction, or (2) there is a clear statement, in the contract, 

 Page 172 

varying the general rule. See Tristram's Landing, 367 Mass. at 630; Currier, 24 Mass. App. Ct. at 107. Neither circumstance obtains here.

 Next, the majority cites a couple of Massachusetts cases that appear to allow the award of a commission as damages for the breach of an exclusive broker agreement. However, while those cases arguably do not align with the cases cited above, neither do they require a different result. The decision in Lattuca v. Cusolito, 343 Mass. 747 (1962), which predates Tristram's Landing, is plainly distinguishable. In that case, the broker and the defendant developers had entered into a series of commercial contracts, as a result of which the broker received the exclusive right to sell the developers' units. Lattuca, supra at 748-749. Lattuca thus involved sophisticated commercial parties, not sellers "involved in real estate transactions infrequently, perhaps only once in a lifetime," Tristram's Landing, 367 Mass. at 630; even more importantly, Lattuca is perhaps an early example of the clear statement requirement being satisfied, because the written "Agreement for Exclusive Real Estate Brokerage" in that case specifically laid out that the broker's rights would be exclusive for two months, after which, for the next two months, the broker would continue "at one-half of the commission earned by any other broker" -- apparently a reference to the broker's right to be paid even if the broker did not secure the buyer for the property. Lattuca, supra at 749 & n.1. [Note Dissent-8]

 The majority also draws on cases from other jurisdictions, declaring that "every jurisdiction that has considered whether a commission may be awarded as expectation damages for breach of an exclusive contract is in accordance with Lattuca." Ante at 160. But passing the obvious point that these out-of-State decisions are neither binding nor written against the backdrop of our Massachusetts case law, the majority in any event sets up a straw man. I agree that a broker may in some circumstances recover a contemplated commission as expectation damages even where 

 Page 173 

the broker did not contribute to the actual transaction; those circumstances are where the parties have clearly stated, in their agreement, that the broker is so entitled. [Note Dissent-9] However, merely stating (or writing) the word "exclusive," or stating that all opportunities must be "refer[red]" to the broker, is not enough; an inexperienced homeowner (or buyer) needs more than that. [Note Dissent-10]

 The majority also suggests that "the record and briefing are inadequate" to determine the advisability of a clear statement rule. Ante at 162. This seems an odd notion; clear statement rules are common in the law, whether directed to improving disclosures, or to imparting clarity and discipline to one who is seeking to vary from a norm. See, e.g., Apkin v. Treasurer & Receiver Gen., 401 Mass. 427, 433 (1988) (recognizing clear statement rule applicable to preemption and waivers of sovereign immunity). But perhaps more importantly, here the clear statement rule I discuss is already recognized in the case law regarding broker contracts; it is not new. See Bump, 24 Mass. App. Ct. at 304; Currier, 24 Mass. App. Ct. at 107. 

 Finally, the majority concludes by setting forth principles that appear to be directed to cabining its own rule. For example, the majority repeats the statement from Bump -- "to establish the existence of an exclusive brokerage, [the broker] has the burden of proving that 'the parties . . . expressly and unambiguously indicate[d] such an intent in the contract.'" Ante at 163, quoting Bump, 24 Mass. App. Ct. at 304. Agreed, but one is left to wonder 

 Page 174 

how the contract alleged by the plaintiffs was sufficient to carry that "heavy" burden here. Ante at 163. Whereas I would affirm the judgment because of a lack of clear statement in the alleged contract, the majority would instead send the matter to the jury, thereby validating the notion that brokers who played no role in a transaction can nevertheless force their principal to pay them a commission under such circumstances. I respectfully dissent. [Note Dissent-11]

FOOTNOTES
[Note 1] WinPlus Realty Group, LLC. 

[Note 2] Paul Mydelski, Xinhang Sun, and Jing Ma. 

[Note 3] The other plaintiff, WinPlus Realty Group, LLC, is Huang's real estate brokerage company. We will refer to the plaintiffs together as "Huang." 

[Note 4] Sun and Ma claim that "[n]o agreement of any kind was made on May 22, 2016." 

[Note 5] We quote the English translation of the e-mail message, which Huang provided with her summary judgment opposition. 

[Note 6] This assertion is contradicted by an e-mail message that Mydelski later sent to Huang, in which he stated: "In your situation with [Sun and Ma], they reached out to us. My agent Gail Winters did ask upon initial conversation 'if the buyers had an agent or if they were working with one or under a buyers agent contract' she was told no." 

[Note 7] Julius Tofias & Co. v. John B. Stetson Co., 19 Mass. App. Ct. 392, 395 (1985), cited in Cantell, 55 Mass. App. Ct. at 555, does involve a real estate brokerage contract, but it does not impose any requirement that such a contract be in writing. Rather, it states that "[o]rdinarily, in the absence of express words or plain indication to the contrary, a broker is not entitled to a commission if his efforts are only a contributing cause to a sale" (emphasis added). Julius Tofias & Co., supra. 

[Note 8] The precise circumstances of how Sun and Ma found and purchased the Bridge Street property are not clear from the record. We take Huang to be claiming that Sun and Ma hired RE/MAX to facilitate the purchase and that this was the conduct constituting the breach. Whether Sun and Ma could be held liable if they bought the property on their own -- that is, without employing RE/MAX or another broker as their buyer's agent -- is not an issue before us. 

[Note 9] The word "damages" appears nowhere in the discussion section of Sun and Ma's brief. In their summary judgment motion, Sun and Ma did argue that Huang could not prove damages, but that argument was tied to their mistaken belief that real estate brokerage agreements must be in writing. The motion raised two other arguments regarding the buyer's agent agreement, both relying on, and improperly adopting as fact, statements made by Huang's counsel in a legal memorandum. Sun and Ma do not renew those arguments on appeal. 

[Note 10] While Sun and Ma, in their motion for summary judgment, did contend that Huang could not prove the existence of a valid exclusive agreement, that argument was based on the assumption that the agreement did not have a fixed duration. That assumption was based in turn on statements made by Huang's counsel, which were inconsistent with the averments in Huang's affidavit. 

[Note 11] All of the Massachusetts cases we discuss involve brokers representing sellers. The parties do not argue that brokers representing buyers should be treated differently. 

[Note 12] See Fitzpatrick v. Underwood, 17 Cal. 2d 722, 733 (1941) ("An agent may recover damages for the breach of an exclusive agency contract by the principal even though he has not produced a purchaser ready, willing and able to purchase, where the breach by the principal consists of preventing the agent from selling the property by selling it himself before the agency contract has expired"); Carlsen v. Zane, 261 Cal. App. 2d 399, 402 (1968) (rule that broker must produce "ready, willing and able" buyer "is applicable only to general, non-exclusive agreements"); International Network, Inc. v. Woodard, 405 P.3d 424, 431 (Colo. App. 2017) (broker "did not assert that it was entitled to a commission it had earned through the sale of the property" but that "seller breached the referral provision [of the exclusive contract], and because of this breach, broker was prevented from procuring the sale"); Clodfelter v. Plaza Ltd., 102 N.M. 544, 548 (1985) ("If an owner breaches an exclusive agreement by negotiating a sale through another broker, rendering performance by the first broker impossible, the first broker may recover his commission without showing that . . . he was the procuring cause of the sale"); Stevenson v. Nichols, 362 Pa. 25, 28 (1949) ("if the agency was exclusive the plaintiff would be entitled to his commission irrespective of who caused the sale"). 

[Note 13] Tristram's Landing, Inc., 367 Mass. at 629, is potentially relevant to the question of damages in one respect: it leaves open the possibility that, even in a nonexclusive situation, the broker might be entitled to a commission where a sale does not close because of a "wrongful act or interference of the seller" -- i.e., where the seller prevents the broker from performing (citation omitted). 367 Mass. at 629. 

[Note 14] Accord Hammond v. C.I.T. Fin. Corp., 203 F.2d 705, 708 (2d Cir. 1953); Covino v. Pfeffer, 160 Conn. 212, 215 (1970); William Raveis Real Estate, Inc. v. Zajaczkowski, 172 Conn. App. 405, 416 (2017); International Network, Inc., 405 P.3d at 431; Joseph M. Silverman, Inc. v. Harrison, 498 A.2d 193, 196-198 (D.C. 1985); Rogier v. American Testing & Eng'g Corp., 734 N.E.2d 606, 616 (Ind. Ct. App. 2000); Pottratz v. Firkins, 4 Kan. App. 2d 469, 472 (1980); Clodfelter, 102 N.M. at 548; Browning v. Johnson, 729 S.W.2d 331, 337 (Tex. App. 1987). 

[Note 15] We are aware of no case that has adopted an equivalent of a clear statement rule in the context of damages. The court in J.C. Nichols Co. v. Osborn, 12 F. Supp. 2d 1196, 1199 (D. Kan. 1998), was addressing the need for a clear statement to create an "exclusive right to sell," as opposed to merely an exclusive agency. Under an "exclusive right to sell" agreement, the owner may not sell the property, either through another broker or through the owner's own efforts, without liability to the contracting broker; under an exclusive agency agreement, the owner may sell the property on his or her own without liability. See Bump, 24 Mass. App. Ct. at 304 n.6. 

[Note 16] It may be appropriate in exceptional cases for a judge to "limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if [the judge] concludes that in the circumstances justice so requires in order to avoid disproportionate compensation." Restatement (Second) of Contracts § 351 & comment f (1981). We cannot determine from the record whether this is such a case. 

[Note 17] To the extent Huang claims that RE/MAX improperly induced Sun and Ma to commit a breach of the listing agreement, that claim fails for the additional reason that Sun and Ma's promise to employ Huang as their listing agent was revocable at will. 

[Note 18] We discern no abuse of discretion in the denial of Huang's motion to amend her complaint, where the motion was filed seven months after the claims against RE/MAX were dismissed. See Afarian v. Massachusetts Elec. Co., 449 Mass. 257, 269-270 (2007). Furthermore, we have reviewed the proposed amended complaint and conclude that it would not have cured the deficiencies identified above. 

[Note 19] The defendants' requests for attorney's fees and double costs are denied. 

[Note Dissent-1] I agree with the majority that an oral real estate broker agreement is enforceable, given the express exception in the Statute of Frauds, and that to the extent they state otherwise, Zang v. NRT New England Inc., 77 Mass. App. Ct. 665, 673 (2010), and Cantell v. Hill Holiday Connors Cosmopulos, Inc., 55 Mass. App. Ct. 550, 555 (2002), are incorrect. Huang's claim accordingly could not be dismissed on the ground that the alleged contract was not in writing. 

 I also agree that Huang's claims against RE/MAX Leading Edge and Mydelski were properly dismissed.

[Note Dissent-2] For present purposes, I do not distinguish between brokers representing sellers and brokers representing purchasers. Our case law draws no such distinction either. 

[Note Dissent-3] The early cases often use the language of "unilateral" or "bilateral" contracts. I do not find that language particularly helpful; indeed, I think it is a misnomer in this context. Cf. Samuel Nichols, Inc. v. Molway, 25 Mass. App. Ct. 913, 915 n.4 (1987) ("Descriptive labels such as 'bilateral' and 'unilateral' are far from universally self-defining and their utility can be limited by context"). 

[Note Dissent-4] A corollary rule is that, generally, the broker must do more than participate in arranging the transaction; he or she must be the "efficient cause of the sale." See Kaplan v. Henry Wenz, Inc., 331 Mass. 480, 486 (1954). 

[Note Dissent-5] At the outset, the majority suggests that the defendants have not raised the issue on which I base my dissent. It suggests that Sun and Ma argue only that the agreement was required to be in writing, and "raise no other argument why they are entitled to judgment as a matter of law." Ante at 155. 

 I disagree. The defendants emphasize in their brief that a broker must be the "efficient and predominating cause" of a transaction to be entitled to a commission; they also emphasize that Huang was "entirely uninvolved" in this transaction. At oral argument, both sets of defendants cited Huang's non-involvement in the transaction as a reason for affirming summary judgment, separately from the lack of a written agreement. The argument that the law does not allow the award of a commission because Huang did not contribute to the transaction thus was clearly before us, as was applicable Massachusetts law, including Bartlett and Tristram's Landing. Moreover, the argument was made in the trial court as well -- including framing the issue as one of available "damages." And in any event, we may of course affirm on any ground supported by the record. See Roman v. Trustees of Tufts College, 461 Mass. 707, 711 (2012). 

[Note Dissent-6] I note that under traditional formulations of "consideration," there was consideration in Bartlett and Des Rivieres -- the brokers had performed work for the sellers, in apparent reliance on the putative agreements. See Marine Contrs. Co. v. Hurley, 365 Mass. 280, 286 (1974) ("consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee"); Graphic Arts Finishers, Inc. v. Boston Redev. Auth., 357 Mass. 40, 42 (1970) (defining detriment as "doing something which he was then privileged not to do" [citation omitted]). 

[Note Dissent-7] I do not find the majority's citation to Coan v. Holbrook, 327 Mass. 221 (1951), particularly illuminating. Unlike the alleged contract here, the written contract in Coan was clear and explicit: the principal agreed "not to withdraw this offer, or to offer said property for sale . . . or make disposition of same otherwise or elsewhere, than through you." Id. at 223. 

[Note Dissent-8] The other Massachusetts cases the majority cites are less helpful than Lattuca. Samuel Nichols, Inc. v. Molway, 25 Mass. App. Ct. 913, 913-915 (1987), a rescript opinion of this court, concludes that on the facts of that case the broker had provided "consideration," sufficient to render the agreement "bilateral." On the facts described, it is difficult to square Samuel Nichols, Inc., with Bartlett and Tristram's Landing. Our opinion in Upper Cape Realty Corp. v. Morris, 53 Mass. App. Ct. 53, 59 (2001), is also plainly distinguishable, as in that case we concluded that as a factual matter the broker had participated in locating the ultimate buyer. 

[Note Dissent-9] The majority's discussion and hypotheticals, ante at 162-163, do not in any way undermine this point. It is true that a clear statement rule would, in effect, establish at least part of the contractual damages in the event of breach of an agreement for an exclusive agency. But contractual damages provisions that establish the remedy in the event of breach are hardly unique or inappropriate. See Cummings Props., LLC v. National Communications Corp., 449 Mass. 490, 494 (2007) (provision establishing liquidated damages enforceable). 

[Note Dissent-10] I note, in any event, that none of the out-of-State decisions are factually on all fours with this one. Some involve commercial contracts, and several involve deliberate acts by the principal to avoid paying a commission. See, e.g., Hammond v. C.I.T. Fin. Corp., 203 F.2d 705, 706 (2d Cir. 1953) (involving broker contract for sale of business); International Network, Inc. v. Woodard, 405 P.3d 424, 429 (Colo. App. 2017) (seller concealed negotiations with buyer for years to avoid paying commission to broker). Some of the cases suggest the need for a clear statement in the contract, similar to the Massachusetts cases I have discussed. See, e.g., J.C. Nichols Co. v. Osborn, 12 F. Supp. 2d 1196, 1199 (D. Kan. 1998) ("a real estate broker seeking to create an 'exclusive right to sell' in which the owner may not sell his property without paying the broker a commission, whether or not the broker procured the buyer, must do so in clear and unambiguous language" [quotation and citation omitted]). 

[Note Dissent-11] I note that although the broker is not entitled to a commission, the broker might be entitled to other types of damages -- i.e., reliance, or consequential damages -- if the broker were to show that the principal led the broker to perform work or to incur out-of-pocket expenses without advising the broker that the principal had begun to pursue opportunities independently, or with another broker. See VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 611 n.2 (1994) (discussing reliance damages -- "i.e., expenditures made in reliance upon a contractual obligation that was not performed"). The plaintiff has not advanced such a theory in this case. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.